IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>    vs.<br><br>JAMES LESLIE LITTLE,<br><br>          Defendant. | DOCKET NO. 1:21 CR 315 |

**SENTENCING MEMORANDUM RE: 18 U.S.C. §§ 3551(b) & 3553(a)(6)**

James Leslie Little, by and through his counsel of record, Assistant Federal Public Defender Peter Adolf, submits this memorandum (1) regarding, at the direction of this Court, the legality of the government's proposed sentence of both imprisonment and probation, and (2) regarding the statutory mandate that this Court consider the "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

## I.  Permissible punishment for petty offenses

The government's strained and fanciful reading of 18 U.S.C. §§ 3551(b) & 3561 supporting its request for a sentence that would be illegal for a felony conviction was recently rejected firmly and concisely by Judge Collar-Kotelly in a related case – vacating, pursuant to Fed. R. Cr. P. 35(a) as "clear error," a sentence she had imposed days earlier without legal objection.

> Section 3551(b) provides a choice among three alternative punishments. If a court chooses to impose probation, it does so pursuant to the terms of § 3561 which prohibits the imposition of probation when the defendant is sentenced at the same time to a term of imprisonment. This further emphasizes the alternative nature of incarceration and probation in any one sentencing decision. Accordingly, a plain reading of the statutory sections at issue – 3551(b) and 3561– leads to the conclusion that a district court must choose between probation and imprisonment when imposing a sentence for a petty offense.

*United States v. Spencer,* 1:21 CR 147, doc. no. 70 at 5 (D.D.C. Jan. 19, 2022) (cleaned up)

(*quoting United States v. Martin,* 363 F.3d 25, 35 (1st Cir. 2004)).

Indeed, the government has previously admitted the weakness of its analysis. When questioned by Chief Judge Howell about why it was asking for restitution payments without asking for a term of probation to provide a mechanism for collection, the government cited the term of incarceration it was asking for, suggesting that a combination of jail and probation was not possible, and admitting that up to that point the United States Attorney's Office for the District of Columbia had never asked for a sentence of both jail and probation in any related case, or indeed in any other case. *See United States v. Griffith,* 1:21 CR 204-4, Transcript of Sentencing at 37-39 (Oct. 28, 2021) (Howell, C.J.).

The government's fundamental mistake is not understanding the obvious purpose of 18 U.S.C. § 3561(a)(3). The government readily admits that a judge may not impose both probation and incarceration as a sentence for a single count of conviction for a felony or class A misdemeanor. More importantly, split sentences are barred for defendants convicted of multiple felony counts, multiple class A misdemeanors, or any combination of both. Rather, the Federal Sentencing Guidelines devote multiple chapters to the thorny problems of sentencing on multiple counts, all to produce a single recommended guideline

range in every case regardless of the number of counts or whether the crimes are related to each other.

The Sentencing Guidelines do not apply to petty offenses at all, however, and do not address what is to be done with a defendant being sentenced simultaneously for both a petty offense and for other more serious crimes.  § 3561(a)(3) simply makes clear that petty offenses are considered separately from the more serious crimes to which the Guidelines apply, and that a judge retains the full range of sentencing options for a petty offense – probation or incarceration – even if the judge is imposing a different type of sentence on more serious charges at the same hearing.  The Guidelines themselves, in commentary, make this explicit:

> Notwithstanding any other provision of the guidelines, the court may impose any sentence authorized by statute for each count that is a Class B or C misdemeanor or an infraction…. Sentences for such offenses may be consecutive to or concurrent with sentences imposed on other counts. In imposing sentence, the court should, however, consider the relationship between the Class B or C misdemeanor or infraction and any other offenses of which the defendant is convicted…. For the sake of judicial economy, the Commission has exempted all Class B and C misdemeanors and infractions from the coverage of the guidelines.

USSG § 1B1.9 comment. (nn. 1 & 2; backg'd).

In short, when a judge sentences a defendant on multiple counts including both serious and petty offenses, the judge simply decides on a sentence on the more serious counts normally, taking the advisory guidelines into account, and then considers the sentences for any petty offenses separately, without being bound in any way by the decision on the more serious counts.  § 3561(a)(3) implements that simple proposition in tandem with § 3553(b).  The former does not give a judge the power to impose a sentence of both probation and imprisonment for a single petty offense.

The government has made similar arguments before at least two other judges of this District in related cases.  No judge has taken up the government's suggestion and imposed such a sentence.[1]

## II.      18 U.S.C. § 3553(a)(6): "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"

Nearly 800 people have been charged with committing offenses in and around the Capitol on January 6, 2021, and over 200 have pled guilty, with only a minority convicted of crimes of violence, theft, or destruction of property.  Most are, and will be, convicted of simply entering the building (and/or particular spaces within the building) without a permit or other permission, just like Mr. Little.  The volume of similar cases is unprecedented in the history of the United States courts, and the statutory mandate under 18 U.S.C. § 3553(a)(6) that this Court impose consistent sentences "among defendants with similar records who have been found guilty of similar conduct" in those cases has never been more important.

> 'I think the thing people miss about the rioters is that it was a really strange crowd, and a diverse crowd in terms of why they were there,' she said.
>
> Some rioters 'looked stupefied that they were inside the U.S. Capitol,' even asking her where the restrooms were. Some were hostile and aggressive, and seemed capable of violence. Others, she says, 'thought they were part of some great revolution.'[2]

---

[1] See doc. no. 31-2 at 5-9.

[2] Dominique Maria Bonessi, "'I Can Be Steady': A Reporter On Documenting The Insurrection From The Inside," *'It Was An Attack On Our Hometown': How 11 Washingtonians Remember The Insurrection,* DCIST (Jan. 5, 2022) (quoting Lisa Dejardins, a political correspondent for PBS NewsHour) (available at https://dcist.com/story/22/01/05/dc-locals-jan-6-capitol-insurrection-anniversary/)

Early in the charging and investigation process, decisions were made at the highest levels of the Department of Justice, in the face of political and public pressure, to separate out different categories of January 6 cases, to focus resources on the most serious offenders, and to resolve the cases of the least culpable with misdemeanor pleas and sentences of probation.  That was an entirely appropriate and just use of prosecutorial discretion.

By the time the undersigned had received the plea offer for Mr. Little and discussed it with the government, five defendants similarly situated to Mr. Little had received non-custodial sentences as recommended by the government, and one more received such a sentence later on pursuant to an agreed-upon non-custodial recommendation.

The government's position in Mr. Little's case, at the end of the day, is entirely inconsistent with its position in those earlier cases, as its memo makes clear:

> [T]he possibility that Little could have done something worse does not change the fact that what he did do that day establishes a need for incarceration. His baseline conduct, breaching the Capitol, is serious: the riot could not have succeeded without the efforts of even more minor contributors like Little. Little's conduct calls for a period of incarceration.

Doc. no. 31 at 10.

> The demands of general deterrence weigh in favor of a term of incarceration and a term of probation in cases where a defendant has pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G ), Parading, Demonstrating, or Picketing in a Capitol Building confinement. Indeed, general deterrence may be the most compelling reason to impose a sentence of a term of incarceration and a term of probation because such defendants contributed to the lawlessness, public disorder, and drained limited law enforcement resources needed to combat the more violent rioters.

Doc. no. 31 at 11-12.  This decision that the "baseline conduct" for a petty offense in cases such as Mr. Little's merits both jail time and probation represents a complete policy

turnaround by the Department of Justice, as noted above, and represents an abdication of the government's responsibilities under § 3553(a)(6) in the face of perceived public and judicial pressure.  Mr. Little is no more culpable than the defendants sentenced to non-custodial probation pursuant to the government's recommendation, as discussed below.

Valerie Elaine Ehrke signed a plea agreement in which the government promised not to oppose non-custodial probation.  Her initial charges were the same as Mr. Little's, and the count she pled to was the same contained in his plea agreement.  She posted a video on Facebook while still inside the Capitol building with the caption "We made it inside, right before they shoved us all out. I took off when I felt pepper spray in my throat! Lol."  Her Facebook profile page showed her to be an adherent of QAnon.

Jessica and Joshua Bustle were sentenced to probation after the government recommended probation with house arrest as a special condition.  Their initial charges were the same as Mr. Little's, and the count each one of them pled to was the same contained in Mr. Little's plea agreement.  During or after the riot, Ms. Bustle posted on Facebook: "Pence is a traitor. We stormed the capital [sic]. An unarmed peaceful woman down the hall from us was shot in the neck by cops. It's insane here." In another message, apparently written after the riot, she wrote "We need a Revolution! We can accept an honest and fair election but this is NOT fair and patriots don't want to see their country brought into communism and destroyed over a lie."

Anna Morgan Lloyd was sentenced to probation, as the government recommended. Her initial charges were the same as Mr. Little's, and the count she pled to was the same contained in his plea agreement.  She posted a photo of herself on Facebook with the caption "Inside the Capitol Building" and then posted: "I'm here. Best day ever. We stormed

the capital building me and Dona Bissey were in the first 50 people in." The next day she posted "We are home .. Thank You to ALL that messaged checking in and concerned. It was a day I' II remember forever. I'm proud that I was a part of it! No Shame. BTW turn off the #FakeNews" and then "That was the most exciting day of my life." She further commented "Dona Bissey I'm so glad we were there. For the experience and memory but most of all we can spread the truth about what happened and open the eyes of some of our friends." Two days after the riot she posted a photos including images of protesters climbing the scaffolding and a protestor holding a stolen and broken sign that read "Speaker of the House." Bissey wrote on the post "This really happened! Anna Morgan-Lloyd took the photo."

Danielle Doyle was sentenced to probation after the government recommended probation including two months of house arrest. Her initial charges were the same as Mr. Little's, and the count she pled to was the same contained in his plea agreement. As the government's sentencing memo recounts: "Doyle entered the Capitol by climbing through a broken window and subsequently stayed in the Capitol building for at least 24 minutes. Capitol CCTV footage from inside the building appears to show Doyle chanting near or yelling at a law enforcement officer. Also, Doyle photographed the destruction that occurred on January 6, including individuals climbing the scaffolding on the West Front of the building, individuals entering the Capitol building through a broken window, and individuals in military-style clothing inside the Capitol. Finally, she texted an open-source video from January 6, taken inside the Capitol and in which she appears, to another individual more than a month after the riot…. Photographs from Doyle's own phone demonstrate that she was a firsthand witness to the destruction at the U.S. Capitol. For

instance, Doyle photographed individuals climbing the scaffolding on the West Front of the building, and she photographed the torn fabric on the exterior of the scaffolding. She also took photographs inside the Capitol building, including of individuals entering the Capitol building through what appears to be the same broken window near the Senate Wing Door that Doyle herself entered. In addition, she photographed individuals dressed in military-style clothing in the Rotunda. Also, on or about January 25, 2021, she texted a third-party individual, 'I literally can't do anymore Q shit. Brandon Stracka was arrested today.[3] He didn't even go in the capitol. This is fucking insane.'"

Andrew Ryan Bennett was sentenced to probation with three months of house arrest, which is what the government recommended.  His initial charges were the same as Mr. Little's, and the count he pled to was the same as for Mr. Little.  Two days before the riot he had posted on his Facebook page: "You better be ready chaos is coming and I will be in DC on 1/6/2021 fighting for my freedom!"  On the day of the riot he began livestreaming video to his Facebook page from outside the Capitol building at approximately 1 :00 p.m., and then livestreamed three videos from inside the Capitol building, capturing himself wearing a hat with the letters "FAFO," an abbreviation of a slogan popular among the Proud Boys.  Although not an official Proud Boys member, he had previously attempted to contact a Maryland chapter of the Proud Boys about becoming a member.

Douglas Wangler signed a plea agreement in which the government promised not to oppose non-custodial probation.  His initial charges were the same as Mr. Little's, and the count he pled to was the same.   He was sentenced to two years of probation along with 60 hours of community service and $500 in restitution.  Mr. Wangler, like Mr. Little,

---

[3] The Stracka case is discussed *infra*.

approached the Capitol from the West; saw people attempting to break into the building

and confronting law enforcement; walked around to the East side of the building to get

away from the violence; entered through already-opened doors where there was no

violence obviously occurring and where "people were freely going in, including what

appeared to be family groups;"[4] wandered around the building without breaking, touching,

or stealing anything; and left.  Wangler, however, was far more aware of the violence

outside before he went in, as he told the FBI that he "recalled seeing a violent crowd when

[he] arrived at the U.S. Capitol building."[5]

> WANGLER stated that, as they approached the U.S. Capitol building, he saw
> people climbing up the scaffolding and waving flags. WANGLER advised that
> there was a large crowd in this area, and people were chanting "U.S.A." and
> singing patriotic songs. WANGLER described the crowd by the scaffolding as a
> "big crazy mob" because they were throwing objects at police officers and
> spraying the police with what he assumed to be mace. In addition, WANGLER
> recalled seeing some fencing that had been torn down and bicycle barricades
> that had been set up to keep people away from the building. WANGLER stated
> that people in the crowd kept trying to break through the barricades and the
> police kept trying to stop them. Both WANGLER and HARRISON stated that
> one of the police officers was spraying people with what looked like a giant
> "super soaker" to control the violent crowd.

> WANGLER...stated [he] watched the crowd by the scaffolding for a short time,
> then decided to go around to the other side of the U.S. Capitol building to get
> away from the violent activities.[6]

The government disingenuously suggests in a footnote that Mr. Little is differently

situated because the above defendants pled earlier.  *See* doc. no. 31 at 14 n.5.  Of course, the

reason those defendants pled earlier was because the government extended plea offers

earlier than it did for Mr. Little, and in those earlier plea offers agreed not to ask for jail

---

[4] *United States v. Wangler & Harrison,* 1:21 MJ 422, doc. no. 1 ("Criminal Complaint") at 7.
[5] *United States v. Wangler & Harrison,* 1:21 MJ 422, doc. no. 1 ("Criminal Complaint") at 6.
[6] *United States v. Wangler & Harrison,* 1:21 MJ 422, doc. no. 1 ("Criminal Complaint") at 6-7.

time.  The government essentially asks this Court to punish Mr. Little more severely for not

promptly accepting an offer he never got.

      Chief Judge Howell criticized the government's very same footnoted argument –

which the government is apparently using in many if not all related cases – pointing out

that the government's changing plea policies are creating potential disparities in violation

of § 3553(a)(6):

> THE COURT: Well, part of the purpose, I guess, of this footnote 4[7] is to basically
> acknowledge that the government has recommended probation in January 6-
> related cases where the defendants have pled early and they didn't, you know,
> personally, physically engage in any assault on a police officer or damage the
> Capitol Building; and it just seems to me that – it is almost suggesting that the
> government did this in some early pleas, but it may not be doing that anymore.

*United States v. Griffith,* 1:21 CR 204-4, Transcript of Sentencing at 20-21 (Oct. 28, 2021)

(Howell, C.J.).

> THE COURT: Well, you know, 18 U.S.C. Section 3553(a)(6) does require
> sentencing judges to consider the need for unwarranted sentencing disparities
> among defendants with similar records who have been found guilty of similar
> conduct.  And I think this means that I have to be concerned about differences
> in the government's recommendations for probation for similarly-situated
> defendants, and then this evolving – and what appears to me to be, sort of, an
> evolving, changing position for defendants sentenced under – for petty offense
> Class B misdemeanor with, essentially, similar conduct on January 6th where
> the government now seems to be recommending jail time.

*Id.* at 23-24.

      Since Mr. Little entered his plea, the following 25 additional similarly-situated

defendants have received non-custodial sentences on the government's recommendation

and in spite of the government's changing plea policies.

---

[7] Footnote 5 in the government's sentencing memo in Mr. Little's case.

Jacob Hiles owns a fishing charter boat business in Virginia Beach, VA, and had bragged to local TV news that he had implemented a policy barring Democrats from his boat.[8]  He arrived at the Capitol with goggles, anticipating that tear gas might be used against him.[9]  He posted a picture of himself on social media that morning wearing a t-shirt with a profane message on the front in which one of the letters was replaced with a logo associated with the Proud Boys, accompanied by the caption "Feelin cute…might start a revolution later, IDK – in Capitol Hill".[10]  He posted multiple videos and photos of himself inside and outside the Capitol on social media, including smoking an unknown substance and bragging about it,[11] and later posted that he "hoped that a large crowd would send a message that we will not allow our rights to be taken."[12]  He was sentenced to non-custodial probation.

Bruce Harrison was with Douglas Wangler, above, and the two were together the entire time and committed the same acts.  Harrison, however, described seeing even more chilling violence before going into the Capitol:

> HARRISON stated that, as they approached the side of the U.S. Capitol building closest to the Capitol Reflecting Pool, he saw a large crowd of people trying to get to the scaffolding and pushing against bicycle barricades that had been set up. He also observed some people in the crowd throwing objects at the police and spraying the police with what he assumed to be mace. HARRISON stated that he saw one person spray the police with a red mist, which might have been bear spray, from several feet away.[13]

---

[8] "Virginia Beach man sentenced to 2 years probation after pleading guilty to U.S. Capitol attack involvement," *WAVY.com* (Dec. 27, 2021) (available at https://www.wavy.com/news/local-news/virginia-beach/virginia-beach-man-sentenced-to-2-years-probation-after-pleading-guilty-to-u-s-capitol-attack-involvement/).
[9] *United States v. Hiles,* 1:21 CR 155, doc. no. 24 at 3.
[10] *See United States v. Hiles,* 1:21 CR 155, doc. no. 1-1 at 3 (fig. 1).
[11] *See United States v. Hiles,* 1:21 CR 155, doc. no. 1-1 at 5.

[12] *Id.* at 4
[13] *United States v. Wangler & Harrison,* 1:21 MJ 422, doc. no. 1 ("Criminal Complaint") at 6.

Mr. Harrison was sentenced to non-custodial probation, as the government recommended.

Eliel Rosa, in addition to the same petty offenses with which Mr. Little was charged, was also charged with the felony offense of obstructing an official proceeding in violation of 18 U.S.C § 1512(c)(2), which carries a maximum penalty of 20 years in prison.  That charge was dismissed pursuant to his plea agreement.

Mr. Rosa had previously worked on a Congressional campaign in which the candidate wrote posts on Facebook that "compared a borderless country to a woman whose value was diminished because she was sexually assaulted…. 'A nation without borders is like a woman raped and defiled, her precious value pillaged and taken,' the post read."[14]  The same candidate then said in a local TV news interview: "'Our nation is like women. If our borders are being encroached, it is like a woman. Like a precious woman, a person that is being defiled by an unruly infiltrator.'"  Mr. Rosa was the candidate's campaign "immigration and policy head."[15]  He received a sentence of probation, as the government recommended.

Thomas Gallagher was inside the Capitol building in a corridor towards the front of a large crowd confronting Capitol police officers, who ordered the crowd to leave. Gallagher and others refused, and he was taken to the ground, pepper sprayed,[16] and

---

[14] Stacy Fernández & Patrick Svitek, "Republican congressional candidate Jamie Berryhill compares borderless nation to a woman 'raped and defiled,'" The Texas Tribune (Feb. 19, 2020) (available at https://www.texastribune.org/2020/02/19/republican-congressional-candidate-jamie-berryhill-makes-sexist-crude/)

[15] NewsWest9, "Cudd, Rosa facing multiple misdemeanor charges in Capitol riots after being arrested by the FBI" (Jan. 13, 2021) (available at https://www.kiiitv.com/article/news/local/jenny-cudd-fbi-arrested-513-fb4ff454-3bf0-4648-8983-660ec8f2601e)

[16] *United States v. Gallagher,* 1:21 CR 41, doc. no. 99 at 4.

arrested,[17] one of the very few arrested that day inside the building.  He received a sentence of probation, as the government recommended.

Thomas Vinson walked around inside the Capitol for about 40 minutes, according to his wife and codefendant, who subsequently gave multiple media interviews expressing remorselessness about her participation and said she would do it again despite losing her job.  Mr. Vinson was sentenced to five years of probation and, *inter alia,* at $5,000 fine, although the judge turned down the government's request for a period of house arrest.

Brittany Dillon bragged about fighting the Capitol Police.  While on the Capitol grounds she texted another defendant:

> 'The DC Police have reached a new low…they shot someone near me. Please come home intact
>
> 'I was there. I got pepper sprayed at the door of the capital and tear gassed 3 times making my way up to it
>
> 'I fought hard…I fell in the door and they tried to beat me with batons so I backed off and they pepper sprayed my eyes.'[18]

She had pushed through a crowd to get to the Senate Carriage Door and fell at the threshold.[19]  She was sentenced to three years' probation as the government requested, with two months of home detention rather than the three months the government requested.

Jonathan Sanders, an Air Force veteran, heard a loud boom and saw a confrontation between police and people in black clothing and helmets; he and his companion later saw someone in the crowd disarm a police officer of his shield.  He then saw tear gas thrown from inside the building into the crowd and observed the Oath Keeps form a line and go up

---

[17] *United States v. Gallagher,* 1:21 CR 41, doc. no. 76 at 3-4.
[18] *United States v. Dillon,* 1:21 CR 360, doc. no. 1-1 at 2.
[19] *United States v. Dillon,* 1:21 CR 360, Statement of Offense at 3-4.

to the doors from which the tear gas was thrown.[20]  When interviewed by FBI agents eight

days later, he initially lied and denied going into the Capitol.[21]  He also bragged afterwards

that he was only 70 feet away from "the lady who was shot inside."[22]  He was sentenced to

three years of probation on the government's recommendation; the judge denied the

government's request for a period of home detention.

Cindy Fitchett was one of the handful actually arrested inside the Capitol.  Before

going in she filmed herself yelling "We are storming the Capitol.  We have broken in.

Patriots arise."  Like Thomas Gallagher she was inside the Capitol building in a corridor in a

large crowd confronting Capitol police officers, who ordered the crowd to leave.  She and

others refused and were arrested.[23]  She was sentenced to probation on the government's

recommendation, and to one month of home detention rather than the government's

recommendation of two months.

Douglas Sweet was accompanying Ms. Fitchett, engaged in the same conduct, and

was arrested along with her.  The government considered him the more culpable of the

two:

> Comparing the circumstances of Fitchett's conduct to Sweet's, the primary
> difference between the two codefendants is that there is evidence Sweet had
> a political agenda in traveling to Washington and ultimately breaching the
> Capitol on January 6. Fitchett, on the other hand, appears to have tagged along
> for the ride, and the video evidence showed she followed Sweet inside the CVC.
> And while Sweet has accepted responsibility for his conduct, he, unlike
> Fitchett, has not yet expressed remorse. For these reasons, the government is
> requesting a greater period of home detention for Sweet.[24]

---

[20] *United States v. Sanders,* 1:21 CR 384, doc. no. 31 at 6.
[21] *United States v. Sanders,* 1:21 CR 384, doc. no. 31 at 9.
[22] *United States v. Sanders,* 1:21 CR 384, doc. no. 31 at 8.
[23] *United States v. Fitchett,* 1:21 CR 41, doc. no. 82 at 3-4.
[24] *United States v. Fitchett,* 1:21 CR 41, doc. no. 114 at 15.

Nevertheless, Mr. Sweet received the same sentence as Ms. Fitchett, including probation and one month of home detention.

Sean Cordon was apparently armed with canisters of bear spray when he arrived at the Capitol.[25]  He also –

> (1) witnessed rioters fighting with law enforcement outside the Capitol and persisted in entering anyway; (2) entered soon after the initial breach at the Senate Wing door by climbing through a window; and (3) dressed in preparation for violence by dawning a vest of body armor and carrying a gas mask.[26]

Finally, after exiting the Capitol Mr. Cordon gave an inflammatory and defiant interview to a newspaper reporter outside the building.[27]  He was sentenced to probation at the government's recommendation – a mere two months – and the sentencing judge declined to impose a recommended period of home detention.

John Wilkerson IV "joined other rioters on the West Side of the Capitol, where he saw the USCP trying to defend the Capitol. Wilkerson saw other rioters attacking police with pepper spray and weapons and eventually breaking through the police line at that location as well."[28]

> After rioters broke through this line of USCP officers, Wilkerson climbed with other rioters up the steps on the West side of the Capitol, through scaffolding that had been set up for the Inauguration and then through the canvas wrapping of scaffolding that had been torn away by other rioters…. Upon approaching the Senate Wing door, Wilkerson could see broken glass littering the ground… Wilkerson stepped over the broken glass and entered the Capitol Building through the Senate Wing door from the North West Terrace, as a piercing alarm sounded throughout the area.[29]

---

[25] *United States v. Cordon,* 1:21 CR 269, doc. no. 31 at 1.
[26] *United States v. Cordon,* 1:21 CR 269, doc. no. 31 at 1-2.
[27] *United States v. Cordon,* 1:21 CR 269, doc. no. 31 at 9-11.
[28] *United States v. Wilkerson,* 1:21 CR 302, doc. no. 23 at 4
[29] *United States v. Wilkerson,* 1:21 CR 302, doc. no. 23 at 5-6.

A week later, "Wilkerson sent [a] Facebook message to a Facebook user stating in substance that he hoped the military would soon make a 'power play' to continue the job started by the rioters.[30]   He was sentenced to three years of probation at the government's recommendation, although the judge declined the government's request for home detention.

Caleb Jones "observed individuals removing barricades erected to prevent entry into the U.S. Capitol" and "scaled a U.S. Capitol wall to access the first floor of the U.S. Capitol's exterior."  He entered the Capitol through the Senate Wing Door and "was subjected to the tear gas and only then decided to exit the U.S. Capitol."[31]  Mr. Jones was sentenced to probation with two months of home detention at the government's request.

Terry Brown was another of the very few arrested inside the Capitol building.  Like Thomas Gallagher, Cindy Fitchett, and Douglas Sweet, he was inside the Capitol building in a corridor in a large crowd confronting Capitol police officers, who ordered the crowd to leave.  He and others refused and were arrested.[32]  The following day, he gave a newspaper interview in which he said "I don't regret doing what I did, because we got a message across and the world knows it."[33]  Mr. Brown was sentenced to probation and home detention pursuant to the government's recommendation, although the judge imposed a sentence of 30 days of home detention rather than the 45 days the government requested.

Andrew Wrigley "(1) heard concussive sounds, smelled tear gas and saw officers in riot gear; (2) he entered the Capitol through the Upper West Terrace doors breached by rioters only four (4) minutes earlier; (3) he heard a fire alarm going off in the building and

---

[30] *United States v. Wilkerson,* 1:21 CR 302, doc. no. 23 at 8.
[31] *United States v. Jones,* 1:21 CR 321, doc. no. 23 at 2, 5-7.
[32] *United States v. Brown,* 1:21 CR 41, doc. no. 151 at 2-3.
[33] *United States v. Brown,* 1:21 CR 41, doc. no. 151 at 4.

heard rioters leaving as he entered say 'they don't want us here'; and (4) proudly posted about the riot on social media after the event on his Facebook account, which became inaccessible after January 8, 2021."[34]  He was sentenced to probation on the government's recommendation – 18 months' worth – although the sentencing judge declined to add a period of home incarceration requested by the government.

Jennifer Parks "entered the Capitol Building through an entrance where the doors had been broken and opened,"[35] and by her own account remained inside for between 30 and 60 minutes.[36]  She was sentenced to probation on the government's recommendation, although the sentencing judge declined to add a period of home incarceration requested by the government.

Nicholas Reimler entered the Capitol through the Senate Wing door "and posted videos from inside the Capitol building to Snapchat with a banner stating, 'TOP OF THE US CAPITOL DOME' and a caption stating, 'Lol what's going on.'"[37]  He was sentenced to probation and home detention pursuant to the government's recommendation, although the judge imposed a sentence of one month of home detention rather than the two months the government requested.

Andrew Hatley entered the Capitol through a window that had been smashed open wearing a respirator mask.[38]  Presumably, therefore, he travelled to Washington, DC knowing there was a possibility that he would be tear-gassed by police, and had equipped himself to resist any such police action.  He was sentenced to probation on the

---

[34] *United States v. Wrigley,* 1:21 CR 42, doc. no. 35 at 1-2.
[35] *United States v. Parks,* 1:21 CR 363, doc. no. 27 at 4.
[36] *United States v. Parks,* 1:21 CR 363, doc. no. 27 at 8.
[37] *United States v. Reimler,* 1:21 CR 239, doc. no. 31 at 1, 3.
[38] *United States v. Hatley,* 1:21 CR 98, doc. no. 31 at 3

government's recommendation, although the sentencing judge declined to add a period of home incarceration requested by the government.

Rachael Pert and Dana Winn are both veterans of the United States Navy.  While travelling from Florida to the District of Columbia,

> they recorded a Facebook live video wherein Defendant Winn states '[g]ot her flags, come with her flagpole, that way I can hit Antifa in the head if need be' demonstrating he was aware of the potential for violence that day and prepared accordingly; both defendant's [sic] gained entry into the Capitol building shortly after the building was breached; (3) both defendants, by their own admissions, were part of a large group that were tear-gassed in an effort to clear the building; (4) as both defendants walked further away from the building and looked out over the Capitol grounds Defendant Pert stated '[w]ow, all those barricades are down now. Remember when we came in? There was barricades.' Defendant Winn responded '[t]he patriots took em.' and; (5) directly after exiting the Capitol building, in a video recorded by Defendant Winn, Defendant Pert and Defendant Winn engaged in the following exchange:
>
>> Pert: [talking to Winn] They said we stopped the vote.
>>
>> Winn: We stopped the vote?
>>
>> Pert: That's what they said, some people were saying we did stop the vote.
>>
>> Winn: Isn't that what we were trying to do? [40 seconds later]:
>>
>> Pert: [talking to unknown person] We were inside!
>>
>> Winn: And they were gassing us.
>>
>> Pert: We were trying to storm them to stop the vote and they were starting tear gassing and forcing us out.[39]

---

[39] *United States v. Pert & Winn,* 1:21 CR 139, doc. no. 49 at 1-2.

Pert was sentenced to probation on the government's recommendation, although the sentencing judge declined to add a period of home incarceration requested by the government.[40]

Gary Wickersham, an Army veteran,

> (1) ... was among the first people to reach the Capitol by ascending the staircase near the NW Scaffolding seconds after the police line there was breached; (2) Wickersham was among the first people to breach the Capitol via the Senate Wing Door ... (3) the defendant is seen speaking with a law enforcement officer, swiping away—and possibly making physical contact with the officer's arm while on the front line of rioters in the Crypt; (4) when defendant exited the Capitol through the door that leads to the Capitol's Upper West Terrace, he held it open for other rioters to enter and pointed back inside; (5) approximately five days after the riot, defendant told an FBI agent that he believed that his presence in the Capitol was justified given his status as a taxpayer and that the whole things was a setup by antifa; and (6) during that same interview, Wickersham admitted that he saw the rioters committing acts of violence against law enforcement officers, but still he went into and through the Capitol.[41]

He was sentenced to probation and home detention pursuant to the government's recommendation,[42] although this Court imposed a sentence of 90 days of home detention rather than the four months the government requested.

Esther Schwemmer accompanied Jennifer Parks, discussed above.  Ms. Schwemmer was sentenced to probation on the government's recommendation, although the sentencing judge declined to add a period of home incarceration requested by the government.

---

[40] Winn was sentenced to probation on the government's recommendation, although the judge imposed 10 days of intermittent incarceration rather than the three months of house arrest recommended by the government.

[41] *United States v. Wickersham,* 1:21 CR 606, doc. no. 20 at 1-2.

[42] The government noted that "the totality of Wickersham's actions place him in the range of defendants for whom the government has recommended incarceration. The government does not do so here considering the defendant's age, the defendant's complete lack of contacts with the criminal justice system throughout his long life, and the fact that the defendant appears to have accepted responsibility for his actions." *United States v. Wickersham,* 1:21 CR 606, doc. no. 20 at 2.

Kenneth Kelly, an emergency room doctor,

sent boastful texts to family members expressing his pride about having participated in the riot. Specifically, the defendant bragged about how he and other rioters entered the Capitol2 "via breaking in windows" while the Senate was in session debating Arizona's electoral vote count on January 6, 2021." ECF No. 1-1 (Statement of Facts), at 4. He also bragged about how he caused senators to "hid[e] under ther [*sic*] desks," and "forced [Congress] into recess." Id. Further, the defendant's description of his conduct as "patriotic" in these text messages—even after he had personally observed violence between law enforcement officers and rioters—not only demonstrates his lack of remorse that day, but also raises concern about the defendant's future participation in similar riotous and antidemocratic conduct. The defendant's statements after January 6 evince a disrespect for the most fundamental tenets of our democracy, and a disregard for the safety and security of our country's leaders.

...

As the crowd swelled in size, Kelly chose to partake in, and contribute to, the chaos by climbing over the ledge of the stone staircase and joining the scores of rioters who were packed shoulder-to-shoulder on the staircase. In fact, during a debrief with law enforcement, Kelly acknowledged that he had to be pulled up on to the staircase by other rioters because the ledge was too high to mount on his own.

When the defendant ascended the stairs to the Upper West Terrace, he witnessed law enforcement officers forcibly pushing rioters away from the Capitol Building. Instead of leaving the premises at that point, Kelly chose to walk toward the Senate Wing door and enter the Capitol Building. During his debrief, Kelly acknowledged seeing broken windows next to the door he entered. Indeed, in text messages to family, Kelly bragged about how rioters had entered the Capitol Building "via breaking in windows." Statement of Facts, at 3. Finally, instead of heeding an officer's advice to exit the Capitol Building through the Senate Wing door behind him, Kelly...chose to turn around and continue walking south through the Capitol before exiting a couple [*sic*] minutes later.

....

[I]n texts to a family member on January 6, Kelly celebrated the destructive and violent acts of his fellow rioters: 'Inside White House [sic] via breaking in windows . . . Tree of liberty was watered today!'

....

Kelly sent several boastful texts to family, in which he expressed pride

for having participated in the violent breach and for having "taken back" the Capitol that day.  Specifically, Kelly sent [a photograph] of rioters scaling the walls of the northwest staircase with the following text: "Patriots stormed the White House [*sic*], broke in while Senate (with a little s) was in sessiondenating [*sic*] Arizona. The [*sic*] were hiding under ther [*sic*] desks. Forced into recess. Patriots took back our capital today."[43]

Mr. Kelly was sentenced to probation and 60 days of home detention pursuant to the government's recommendation.

Brandon Straka "is a social media influencer who live-streamed his participation in the January 6, 2021 attack on the United States Capitol."

> Straka encouraged and celebrated the violence of that day. In the lead up to January 6, Straka posted a series of messages to his significant number of social media followers indicating that a presidential transition cannot be allowed, that a civil war had begun, and that 'we're not going to be peaceful much longer.' On January 6, Straka posted video footage that he filmed on January 6 to his Twitter page. In the video, Straka can be heard inciting the crowd by yelling 'go, go, go' as the crowd approached the U.S. Capitol and made entry into the U.S. Capitol.
>
> Straka also captured video footage of rioters aggressively taking a riot shield away from a U.S. Capitol Police Officer who was standing near a doorway of the U.S. Capitol. Straka and others can be heard stating 'take it, take it.' The rioters successfully seized the officer's shield and celebrated doing so by chanting 'USA.' After his departure, but while law enforcement was still trying to clear the area, Straka tweeted out, 'Patriots at the Capitol- HOLD. THE. LINE!!!!' Due to his considerable media influence, this message was liked and retweeted by thousands of other Twitter users.
>
> Straka is a former hair stylist who posted a testimonial video to YouTube on June 29, 2018 that went viral, garnering more than 41,000 likes and more than 890,000 views. Brandon Straka, Why I left the Democrat Party. Straka used this exposure to become a social media influencer and political leader, as the founder and president of the '#WalkAway Campaign.' This organization is comprised of the #WalkAway Foundation, a 501(c)(3) not-for-profit organization, and the #WalkAway Campaign PAC, a political action committee. As chairman of the foundation, Straka has reported that he works 60 hours per week to facilitate the organization's mission to 'provide fact-based education through media, live events, speaking engagements, and college campus tours.'

---

[43] *United States v. Kelly,* 1:21 CR 331, doc. no. 36 at 2-3, 8, 10.

In December 2020, the #WalkAway Foundation reported $648,464 in revenue for the prior year. #WalkAway PAC reported gross receipts of $29,101 for the same period. In addition to his fundraising success, Straka has cultivated a substantial social media following, with more than 211,000 current subscribers to his #WalkAway Campaign YouTube channel and, as of January 6, 2021, more than 660,000 Twitter followers. It was in his role as a high-profile president of a political organization and charitable foundation that led Straka to travel the country in the lead up to and in the wake of the 2020 election.

Following the election, Straka stoked the passions of his followers, frequently telling the 'Patriots' that it was time to 'rise up' as part of a 'civil war.' Many of these messages contain rhetorical flourishes that are common in political speech. However, some of Straka's references to concrete planning and action could reasonably have been interpreted by some readers as a call for more than just a figurative struggle. In early December 2020, Straka sent out messages informing them that they 'could not allow' a presidential transition and encouraging his followers to prepare for a civil war.

Then, on December 19, 2020, Straka shared a video of and quoted an individual who stated that it was his intention not to be 'peaceful for much longer.' Straka's post, which was viewed more than 100,000 times, included a message that it was time to 'rise up!'

As Straka stood outside of the U.S. Capitol, he observed people attempting to make entry into the U.S. Capitol. Straka can be heard stating, "We're going in. They're saying we're going in. People are going in." As the crowd moves forward, Straka can be heard stating, "go, go, go." Straka was standing a mere 10 to 20 feet away East Rotunda Doors while encouraging the rioters to enter the U.S. Capitol. [44]

In another text message to a group of supporters, Mr. Straka texted "I just got gassed! Never felt so fucking alive in my life!!!"[45]   Mr. Straka was sentenced to probation and home detention pursuant to the government's recommendation,[46] although the judge imposed a

---

[44] *United States v. Straka,* 1:21 CR 579, doc. no. 36 at 2, 4-10 (footnotes, citations, and links omitted).

[45] *United States v. Straka,* 1:21 CR 579, doc. no. 36 at 11.

[46] The government noted that "the totality of Wickersham's actions place him in the range of defendants for whom the government has recommended incarceration. The government does not do so here considering the defendant's age, the defendant's complete lack of contacts with the criminal justice system throughout his long life, and the fact that the defendant appears to have accepted responsibility for his actions." *United States v. Wickersham,* 1:21 CR 606, doc. no. 20 at 2.

sentence of three months of home detention rather than the four months the government requested.

Julia Sizer "recorded video on her cellphone depicting scores of rioters that had overwhelmed law enforcement on the Capitol's West Side and a tightly packed crowd of rioters with whom she passed through the Parliamentarian Door while alarms blared overhead."[47]  She also falsely denied entering the Capitol when first asked about it by the FBI.[48]  Ms. Sizer was sentenced to one year of probation.  The government had recommended three years of probation and 60 days of home detention.

William Blauser, a Navy veteran, "(1)... pushed his way through the East Rotunda door and (2) he is captured on CCTV having some physical contact with law-enforcement as they Case 1:21-cr-00386-TNM Document 98 Filed 01/27/22 Page 1 of 17 2 were trying to get people to exit the Capitol Building. He lowered his shoulder a bit and pushed into law-enforcement to apparently get access to co-defendant Bauer and extricate her."[49]  The government recommended three years of probation and three months of home detention;[50] the judge imposed neither, and simply sentenced Mr. Bauer to pay a $500 fine and $500 in restitution.

Richard Barnard "penetrated into the Crypt portion of the U.S. Capitol, where violence between rioters and law enforcement was occurring around him, and...he

---

[47] *United States v. Sizer,* 1:21 CR 621, doc. no. 26 at 1-2.

[48] *United States v. Sizer,* 1:21 CR 621, doc. no. 26 at 2.

[49] *United States v. Blauser,* 1:21 CR 386, doc. no. 98 at 1-2.

[50] The government stated that "the totality of Blauser's actions place him in the range of defendants for whom the government has recommended incarceration. The government does not do so here considering the defendant's age, the defendant's complete lack of contacts with the criminal justice system throughout his long life, and the fact that the defendant appears to have accepted responsibility for his actions. Further, the government states that Blauser's efforts to restrain co-defendant Pauline Bauer's confrontation with police in the Rotunda is an important mitigating factor to explain why the government is not seeking active incarceration."  *United States v. Blauser,* 1:21 CR 386, doc. no. 98 at 2.

admitted to deleting evidence from his phone after being notified by his wife that individuals had died during the riots."[51]  Mr. Barnard was sentenced to probation and 30 days of home detention on the government's recommendation.

Jeffrey Witcher accompanied Mr. Barnard, and was filmed "shouting at law enforcement "[d]on't be a traitor! Fulfill your constitutional duties, man. Do or die!";… he penetrated into the Crypt portion of the U.S. Capitol, where violence between rioters and law enforcement was occurring around him, to include rioters overrunning the police line;… he recorded his activities inside the building, to include his participation in shouting and chanting directed at law enforcement, and … he admitted to deleting evidence from his phone while at the airport traveling home from the District."[52]  The government recommended a sentence of three years probation and 60 days of home detention; the judge imposed one year of probation and 30 days of home detention.

Edward McAlanis "was present on the East Front of the Capitol Building, in close proximity to the Rotunda Doors" at the moment the doors were breached.[53]  Video evidence shows him close by as "rioters engage in a heaving maneuver designed to breach the doors while officers are cornered in the entranceway. As they continue to be yelled at, shoved, sprayed with chemical irritants, and struck with flag poles and other objects, the distressed officers bend over and cover their faces to protect themselves. Rioters steal a large riot shield from the officers."[54]  He was sentenced to probation on the government's

---

[51] *United States v. Barnard & Witcher,* 1:21 CR 235, doc. no. 38 at 2.
[52] *United States v. Barnard & Witcher,* 1:21 CR 235, doc. no. 39 at 2.
[53] *United States v. McAlanis,* 1:21 CR 516, doc. no. 19 at 5.
[54] *United States v. McAlanis,* 1:21 CR 516, doc. no. 19 at 5.

recommendation, although the judge declined to add a period of home incarceration
requested by the government.

James Lollis "approached a Metropolitan Police Department ("MPD") officer
positioned outside the Capitol Building and said, 'Y'all on the same team we are, aren't
you?' When the officer didn't respond, Lollis further harassed the officer, saying, 'You're not
going to respond? You're not on the same team?'"  He then "entered the Capitol Building
with a large group of rioters through the Senate Wing Door. As he walked in, he placed a
sticker on the wall. Lollis admitted to the government and to the Court during his plea
hearing that the sticker said 'FUCK ANTIFA.'"[55]  Mr. Lollis was sentenced to probation with
90 days of home detention as per the government's recommendation.

Mr. Little is no more culpable than any of the above individuals and is less culpable
than many.  Moreover, according to the government's own sentencing memo, they have
asked for jail time for 38 defendants[56] convicted of the same charge as Mr. Little; 27 of
those were sentenced to less time than the government asked for, and for a large plurality –
17, or 45% of defendants – the  sentencing judge rejected the government's jail
recommendation entirely and sentenced the defendant to non-custodial probation.[57]  In
only seven such cases did the judge follow the government's recommendation, and judges
imposed higher sentences in just four cases.[58]

The government cites the fact that Mr. Little entered the gallery overlooking the
Senate chamber as an aggravating factor in the case because that was a "sensitive area in

---

[55] *United States v. Lollis,* 1:21 CR 671, doc. no. 19 at 3.
[56] Not counting defendants in pretrial detention, who have thus far received time served sentences.
[57] *See* doc. no. 31-2 at 5-9.
[58] *See* doc. no. 31-2 at 5-9.

the Capitol where the certification process had been underway until rioters began their

assault on the Capitol."[59]  Mr. Little had no knowledge of those facts, and those events were

long over before he arrived.  The government is also well aware that Mr. Little followed

others through a doorway from a large main hallway having no idea what was behind the

door, since there is no signage or unique design that would indicate to the unknowing

observer that the space beyond was meaningfully different from any other space in the

Capitol.  Indeed, unlike the chamber below, the balcony appears to be designed, and was in

fact designed, to accommodate members of the public wishing to watch the Senate

proceedings.  It was not one of the rooms – such as private offices or the Senate floor itself –

that an ordinary observer would recognize as inherently private or intended only for

certain officials.  While the balcony was of course closed to the public at the time, so was

the entire Capitol building.  Mr. Little's entry onto the balcony does not meaningfully affect

the § 3553(a) factors in his case.

It may be inevitable that with so many related cases, and so many Department of

Justice officials involved, there will inevitably be disparities in the government's

recommendations simply because no one can compare and keep track of them all.  The

undersigned is sympathetic to the monumental task the government faces in prosecuting

these cases fairly and expeditiously.  The brutal truth, however, is that the government's

recommendation here is divorced from any reasonable view of the facts of Mr. Little's case

in light of previous recommendations and sentences.  Unfortunately, the arguments and

recommendation in the government's brief were simply copied and pasted from briefs in

other cases without the slightest consideration for what sentence Mr. Little's conduct and

---

[59] *See* doc. no. 31 at 9.

characteristics actually merit: In the very same sentencing memorandum the government writes that **two weeks** of incarceration "would be an appropriate sentence in this case," doc. no. 31 at 25, and that **a month** of incarceration would be appropriate, *see id.* at 1, 26.  Under the command of § 3553(a) that the sentence be "sufficient, but not greater than necessary," both cannot be accurate, and in fact neither is.

The remaining § 3553(a) factors will be discussed at sentencing.

Respectfully submitted:

  s/ Peter Adolf
Peter Adolf
Assistant Federal Public Defender
North Carolina Bar No. 37157
New Jersey Bar No. 038911999
New York State Bar No. 2729671
Attorney for James Leslie Little
Federal Public Defender, Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC 28202
(704) 374-0720 (phone)
(704) 375-2287 (fax)
Peter_Adolf@fd.org

DATE: March 1, 2022